John NESVOLD, Plaintiff,

v.

Otis R. BOWEN, Secretary of Health and Human Services, Defendant.

Civ. No. S 87-97.

United States District Court,
N.D. Indiana,
South Bend Division.

April 14, 1988.

Aladean M. Derose, South Bend, Ind., for plaintiff.

Clifford Johnson, Asst. U.S. Atty., South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

This is an action related to those provisions of the Social Security Act which provide for establishment of a period of disability and payment of disability insurance benefits where the requirements specified therein have been met. 42 U.S.C. §§ 416(i) and 423. The jurisdiction of this court to review the final decision of the Secretary is stated at 42 U.S.C. § 405(g).

The plaintiff, John Nesvold, filed his application for disability insurance benefits on May 29, 1985, alleging an onset date of February 11, 1985. His claim was denied initially and on reconsideration. Mr. Nesvold then requested and was granted a hearing, which was held before Administrative Law Judge (ALJ) John Evans on December 3, 1985. ALJ Evans took testimony from the plaintiff, the plaintiff's ex-wife, and Dr. David Abramson, a specialist

in cardiovascular disease, who was enlisted by the ALJ as a medical advisor.

The plaintiff's testimony consisted of a review of his work history and daily activities. Mr. Nesvold stated that he had loved one job so much that he had to be tapped on the shoulder and told to go home at the end of a ten-hour day. During any periods of layoff he sought additional jobs, but found after suffering a heart attack that he could not do welding because he would choke on fumes from the electro rod.

Mr. Nesvold testified that after his heart attack, his friends on the job "covered" for him by doing his work. He was able to get his most recent job only by having someone else take the pre-employment physical for him. At one point in discussing his work history it became necessary to recess, due to signs of emotional stress in the plaintiff. He stated that not being able to do anything made him feel useless, and acknowledged recent difficulty in getting along with others.

The plaintiff's ex-wife corroborated Mr. Nesvold's incapacity to do any of the chores he once had done. She testified that even going down the stairs and back up with a small load of clothing would leave him exhausted and breathless. She agreed that the plaintiff's mood had changed greatly and that he now becomes upset very easily.

The medical advisor later described Mr. Nesvold as a "Type A" personality, stating that as a hypertensive Type A, Mr. Nesvold would need to avoid emotional stress. Dr. Abramson opined that the plaintiff's story "certainly would support the diagnosis of angina pectoris." He thought it a good possibility that the pain in the plaintiff's chest was due to coronary arteriosclerosis, but could not be certain without an angiogram.

Dr. Abramson directed his comments to a stress test dating from May of 1985. The test was conducted by Dr. Carol Schobert, a specialist in internal medicine who was the plaintiff's treating physician. Dr. Abramson noted that it was an "acceptable test" technically, in the sense that the plaintiff reached the target heartrate, so as

not to meet listing 4.04A. He observed, however, that there were changes in the electrocardiogram in the post-exercise period, and that the plaintiff's history would support a diagnosis of ischemic heart disease.

At the close of the hearing, the record was kept open to receive the results of a cardiac catheterization, which had already been scheduled with cardiac specialist Joel D. Eisenberg, for December 9, 1985, about a week after the hearing. This test was subsequently performed as scheduled. Dr. Eisenberg noted from the test, a 70–75% mid-lesion of the right coronary artery, which he felt would be amenable to bypass grafting, a 90% proximal lesion of the second obtuse marginal, and a 75% lesion in the proximal portion of the posterolateral branch of the distal circumflex.

On January 20, 1986, medical advisor Abramson reviewed Dr. Eisenberg's report noting a

complete occlusion of the anterior decending artery, 70 to 75% stenosis of the right coronary artery in its midportion, and complete occlusion of the marginal branches (or almost complete occlusion) of the circumflex artery.

The medical advisor further noted from the report, the presence of "a fairly large aneurysm of the apical portion of the heart." The proximal anterior, anterobasilar wall was described as hypokinetic. There was found a "discrete aneurysm involving the distal septum" which was "evidently part of the aneurysm of the anteroapical location."

Dr. Abramson stated that Dr. Eisenberg had strongly suggested excision of the aneurysm and bypass surgery for three coronary arteries, excluding the anterior descending artery. The ventricular aneurysm was thought to be the probable cause for dyspnea and the possible cause for the angina pectoris from which the claimant suffered.

From the catheterization report, Dr. Abramson revised his earlier views, concluding that the plaintiff met the Listing 4.04(B)(7)(b). He noted again that the old

record included a stress test which showed no ST segment depressions with 7 mets of work, but that following its termination, abnormal changes were noted in the post-exercise period. Dr. Abramson opined that these abnormal changes would have "real significance with regard to the functional capacities of the heart" even though such changes would not technically have met the requirements of a Listed Impairment. He believed that "the presence of a ventricular aneurysm definitely reduces the capacity of the left ventricle to perform physical work," adding that "[i]ts presence represents a definite risk to the existence of the claimant."

Three doctors, including a treating internalist, a treating cardiologist, and the administration's medical advisor, who is also a cardiologist, agreed that the plaintiff's condition meets or equals a listed impairment. The only contrary medical evidence consisted of the opinions of two non-examining DDS physicians who, on the basis of an incomplete record, found a residual functional capacity in the plaintiff for light work. One of these agency consultants listed no specialties; the other listed pediatrics. Inasmuch as the case was properly decided at level three, these reports are inapplicable. In any event, they would not constitute substantial evidence viewing the record as a whole, even if the case were such that it should be decided at level four or five of the sequential evaluation.

In arriving at his decision, ALJ Evans considered "all the documents identified in the record as exhibits, the testimony at the hearing and arguments presented." He concluded that the plaintiff met the disability insured status requirements, that he had not engaged in substantial gainful activity since the alleged date of onset, and that the medical evidence established a severe ischemic heart disease with angina. The ALJ further found that the severity of Mr. Nesvold's impairment met the requirements of section 4.04(A), Appendix 1, Subpart P, Regulations No. 4, precluding him from working for at least 12 continuous months. Mr. Nesvold was, therefore, found to be entitled to a period of disability and disability insurance benefits from February 11, 1985. The ALJ recommended re-evaluation in one year to see if, after surgery, the plaintiff is able to perform substantial gainful activity.

The decision of ALJ Evans provided a thorough and reasoned review of the record, and his decision is fully supported by substantial evidence. At this point the case might have been closed and concluded simply and fairly. It was not. By way of its "own motion review" the Appeals Council overturned the decision of the ALJ, alleging legal error in his finding of a listed impairment, and in his failing to give proper consideration to RFC assessments by agency physicians. Principally the Appeals Council found that the plaintiff's May, 1985 stress test showed a capacity for light work, but that the later catheterization reduced the plaintiff's RFC to sedentary work, and that he was not disabled.

These conclusions are not supported by substantial evidence, are contrary to the evidence, and are based on erroneous applications of law.

## II.

Pursuant to 20 C.F.R. § 404.969, within 60 days after the date of a hearing decision or dismissal, the Appeals Council may decide to review the action taken and must notify all parties of the review by mail.

Such a review will be undertaken where the council finds abuse of discretion by the ALJ, error of law, lack of substantial evidence to support findings and conclusions, or broad policy or procedural concerns which may affect the public interest. 20 C.F.R. § 404.970(a)(1)–(4).

If new and material evidence is submitted, the Appeals Council will consider it only if it relates to the period on or before the date of the hearing decision. If such evidence relates to this period the Council will evaluate it along with the entire record, reviewing the case if the ALJ's action, findings or conclusion are contrary to the weight of the evidence currently of record. 20 C.F.R. 404.970(b).

The law of this circuit is clear, and this court has previously recognized, that the

Appeals Council has authority to review an ALJ's decision on its own initiative *for any reason.* See *Bauzo v. Bowen,* 803 F.2d 917, 920–21 (7th Cir.1986), overruling the holding in *Scott v. Heckler,* 768 F.2d 172, 178 (7th Cir.1985), that § 404.970(a) limits the review authority of the Appeals Council to those reasons itemized there. The Appeals Council is not so limited. See *Scott v. Bowen,* 652 F.Supp. 1477, 1478–79 (N.D. Ind.1987). Here, the Appeals Council found legal error in the ALJ's finding that Mr. Nesvold's condition met Listing 4.04(A) of Appendix 1, Subpart P, SSA Regulation No. 4, in reliance on the testimony of the agency's medical advisor. In detailing this alleged error, the Council noted that although the medical advisor found by post-hearing letter that catheterization results met the listing, he had explained in the hearing that 4.04(A) was not met by the treadmill results, and that proper treadmill test findings will take priority over cardiac catheterization findings. Throughout the record it is indicated that the Appeals Council relied on a "new medical opinion" which supposedly confirmed that the requirements of 4.04(A) were not met. Having examined the record carefully, this court could locate no such report on file. Even if it were, it could not in light of this record be considered controlling.

The Council further found error in the fact that the ALJ sustained an objection to inclusion of RFC assessments by agency physicians. Although the hearing transcript indicates that the exhibits containing these reports would not be admitted, they are, in fact, evidence of record, and the decision of the ALJ indicates that all exhibits were considered. This is similarly an illusory issue since the particular exhibits would not qualify as substantial evidence.

■ Despite carte blanche authority of the Appeals Council to review any and all ALJ decisions, once the Council announces a reliance on one of the § 404.970(a) conditions, proper application of that condition is a matter for judicial review. *Scott v. Heckler,* 768 F.2d 172, 178 (7th Cir.1985), noted in 42 U.S.C.A. § 404.970 at p. 409 (1988). It is, however, the decision of the Appeals Council, and not that of the ALJ that is the final decision of the Secretary subject to the review of this court. The court's review is limited to determining whether the Appeals Council's decision is supported by substantial evidence on the record as a whole. *Bauzo* at 919, and, of course, whether the reasoning is erroneous as a matter of law.

Before considering the facts and law related to this case, the court notes that plaintiff's counsel has argued that the record suggests that review by the Appeals Council was stimulated by the fact that the file had been stamped at one point, "A/C BELLMON CONTROL" and at another, "BELLMON CASE", allegedly rendering its treatment by the Appeals Council suspect under the law. See, *Ass'n of Administrative Law Judges v. Heckler,* 594 F.Supp. 1132 (D.C.1984); *Barry v. Heckler,* 620 F.Supp. 779 (N.D.Cal.1985); *Barry v. Bowen,* 825 F.2d 1324 (9th Cir.1987). See also *W.C. v. Heckler,* 629 F.Supp. 791 (W.D.Wash.1985) (requiring compliance with statutory notice and comment procedures in order for the program to be valid). See also *Bauzo* at 922 n. 2, reviewing the history of the Bellmon Amendment.

It is impossible for this court to determine from the record whether review was somehow triggered in connection with ALJ Evans' disability allowance rates. It appears from *W.C.* that the agency formally discontinued this approach in June of 1984, nearly two years before the decision. For purposes of this review the court considers the identification of Mr. Nesvold's file as a "BELLMON CASE" to be irrelevant to its decision. Cases related to the Bellmon Control system are of interest, however, in terms of understanding the bureaucratic pressures under which ALJ's have labored. More pertinent to this review, however, is the fact that 20 C.F.R. § 404.969 *et seq.,* and cases interpreting the review authority of the Appeals Council, leave no doubt as to the broad authority of the Council to undertake review. The real issue is whether the reasoning of the Council is supported by law and substantial evidence. Here it is not.

■ Substantial evidence means more than a mere scintilla; rather, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Ray v. Bowen,* 843 F.2d 998 (7th Cir.1988). Although this court does not reweigh evidence, decide facts anew, or substitute its own judgment for that of the Secretary, it is not an uncritical rubber stamp for the Secretary's decision. *Bauzo* at 923, and cases cited therein. Where substantial evidence is found the court will affirm the Secretary's decision absent an error of law. *Fox v. Heckler,* 776 F.2d 738 (7th Cir.1985).

In evaluating a case that involves a step 3 determination, an ALJ is not bound automatically by a doctor's conclusion that a claimant is "disabled" because he meets the requirements of a certain listing. *Waite v. Bowen,* 819 F.2d 1356, 1359 (7th Cir.1987), citing *Garrison v. Heckler,* 765 F.2d 710, 713 (7th Cir.1985). Rather, a finding of disability will be based on a review of the medical findings and other evidence that supports a physician's statement about disability. 20 C.F.R. 404.1527. A decision about the medical equivalence of a listing must be based on medical evidence. "Any medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. 404.1526(b). The medical opinion given by one or more medical or psychological consultants designated by the Secretary will also be considered. *Id.*

Here the medical evidence is conclusive that the plaintiff suffers from a 4.00 impairment of the Cardiovascular System, of the category 4.04, ischemic heart disease with chest pain of cardiac origin. This conclusion is fully supported by the medical evidence. Whether the plaintiff's condition met the requirements of 4.04(A) on the basis of his treadmill test, or whether he met the requirements of 4.04(B)(7)(b) from angiographic evidence, he clearly met or equalled a listed impairment on the basis of all the evidence. The Secretary's contrary viewpoint is contrary to the evidence and contrary to law.

Although it appears that the matter has not been addressed in this jurisdiction, the administration's preference for a stress test to the exclusion of other evidence in cases involving ischemic heart disease, has been held to conflict with provisions of 42 U.S.C. §§ 423 and 1382, which require an opportunity to present all relevant evidence. *New York v. Bowen,* 655 F.Supp. 136, 142 (S.D.N.Y.1987). Although the Appeals Council appeared in the narrative portion of its analysis to acknowledge and consider the results of a cardiac catheterization, an irrational mind-set similar to that found in *New York v. Bowen, supra,* is apparent in its findings. Here, the Council not only wishes to prioritize the treadmill over the catheterization, which in appropriate circumstances has a legal foundation, but it would impose its own interpretation of the treadmill test over the interpretation of the test administrator and a second treating specialist.

Pursuant to Appendix 1 to Subpart P, 4.00(G)(4), a treadmill test is the "primary basis for adjudicating claims under 4.04." "However, the significance of findings of a treadmill exercise test must be considered in light of the clinical course of the disease which may have occurred subsequent to performance of the exercise test." Here abnormalities appeared immediately following exercise, and a cardiac catheterization some six or seven months later confirmed the severity of the disease and met a 4.04(B)(7)(b) listing.

Subsection G4, which described proper evaluation of a stress test also indicates that "[t]he criteria in 4.04B (pertaining in part to angiographic evidence) are not applicable if there is documentation of an acceptable treadmill exercise test...." Here, two doctors considered the test positive and one considered it abnormal. Subsection G4 continues, stating that "... if there is no evidence of a treadmill exercise test or if the test is not acceptable, the criteria in 4.04B should be used." This part provides that absent an acceptable treadmill exercise test under 4.00(G), angiographic evidence showing, among other conditions, a 70 percent or more narrowing of a proximal coronary artery will satisfy

the listing. Whether the treadmill is considered positive, or whether it is considered unacceptable, the plaintiff's condition clearly meets one of the two listings. There is no relevant evidence to support any other conclusion. The ALJ properly decided the case at level three, at which the analysis stops with a finding of disability. 20 C.F.R. §§ 404.1520(d), 416.920(d); *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986); *Guzman v. Bowen*, 801 F.2d 273, 274 (7th Cir.1986).

### III.

The Appeals Council's findings that the plaintiff's impairments were not medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4, and that the plaintiff can perform sedentary work are not supported by substantial evidence and are contrary to the evidence.

In reviewing the evidence, the Council adopted the evidentiary facts recited in the ALJ's decision with certain modifications. It is agreed that John Nesvold was born on December 23, 1937, and was, at the time of the ALJ's decision, forty-eight years old, with an eighth grade education. Prior to filing for disability, the plaintiff worked as an electrician and welder in the construction industry. Both the ALJ and the Appeals Council are in agreement that Mr. Nesvold cannot perform in any prior relevant work. If in fact this were a case properly to be decided beyond step three, which it is not, the burden of production would have shifted to the Secretary to show a residual functional capacity for other work. The Secretary made no such showing and the record does not support an RFC for any work.

Mr. Nesvold stopped working on February 11, 1985. He testified that since a heart attack some years before that date, he has been short tempered, has chest pains and shortness of breath, and cannot do the things that he used to do. With the severity of the pain, Mr. Nesvold must stop what he is doing until the pain subsides. He was known to be a workaholic and always busy. He now gets upset easily. He cannot climb stairs. He testified that

vocational rehabilitation had informed him that it could not help him.

Mr. Nesvold stated that his doctors had told him that his condition will slowly get worse. He indicated that he has headaches when he takes Nitro pills, and that he experiences pain and shortness of breath with and without exertion, and chest pain even at rest. He alleged episodes of dizziness, and felt he could stand about ½ hour, and walk two blocks with rest despite shortness of breath and chest pain. He visits the doctor once a month.

In reviewing the medical evidence the ALJ referred to exhibits 14–17, 27, and 29 consisting of medical records from LaPorte Hospital and Clinic dating from May 23, 1985 to December 10, 1985. In the earliest testing, an M-mode Echocardiography revealed concentric left ventricular hypertrophy. A 2–D Cross Sectional Echocardiography confirmed abnormal septal contraction with a buckling appearance in the mid-septum with markedly decreased contraction at base of the heart. These findings were compatible with an old septal myocardial infarction. A June 7, 1985 report showed a diagnosis of old myocardial infarction with angina, hypertension and obesity, with dyspnea, fatigue and angina. Chest pain was described as cardiac in origin, of a substernal, squeezing type.

A key matter of controversy in this case is the stress test performed on May 23, 1985, by Dr. Carol Schobert. The Appeals Council would have this court ignore Dr. Schobert's interpretation of the test which she herself conducted. ALJ Evans reported that the May stress test was "abnormal due to post exercise ST-T wave changes." The medical evidence supports this conclusion. Not only the administering physician, but also Dr. Eisenberg, the cardiologist who later performed catheterization, read the stress test as positive.

Dr. Schobert interpreted the test as follows:

Resting EKG is abnormal—shows sinus rhythm with occasional PVC's. There is evidence of old anterior and inferior wall infarction. No significant change with standing or hyperventilation. He exer-

cised using the Standard Bruce Protocol. Total duration of exercise was 6 min. 23 sec. reaching an estimated met level of 7. Maximum heartrate achieved was 147 which is 85% of predicted maximum. Test was terminated due to fatigue and weakness. Heartrate and blood pressure response were normal. PVC's were present both at rest and with exercise but did not increase in frequency with exercise. There were no complaints of chest pain, however, at end exercise he had some transient pain about the left elbow area. There were no significant ST–T changes with exercise. However, in the post exercise period he developed some straightening of the ST segments with inversion of T waves inferiorly and in the lateral precordial leads. The T wave changes persisted for approximately 15 min. post exercise. IMPRESSION: 1) Abnormal stress test because of post exercise ST–T changes. There were no complaints of chest pain and exercise tolerance was fairly good.

In a letter dated October 10, 1985, Dr. Schobert stated that Mr. Nesvold "suffered a large myocardial infarction in 1977, has high blood pressure and residual angina currently under fair control with medications." She indicated that his echocardiogram showed moderate to marked decreased contractility of the left ventricle, and that a "treadmill test was positive." She declared that because of his disability "he is and remains completely and permanently disabled." Dr. Eisenberg concurred. Dr. David I. Abramson, from a letter dated January 20, 1985, discussed the stress test as follows:

"By itself, the information noted above [in reference to a cardiac catheterization performed a little over six months after the stress test] would satisfy Listing 4.04B7(b). However, the old record includes a stress test which demonstrates no ST segment depressions with 7 mets. of work. *It is necessary to note that following the termination of the test, abnormal changes were noted in the post-exercise period. I believe that this has real significance with regard to the functional capacity of the heart even though such a change is not noted in Listing 4.04A. The presence of a ventricular aneurysm also definitively reduces the capacity of the left ventricle to perform physical work. Its presence represents a definite risk to the existence of the claimant* (emphasis added).

In describing the stress test the plaintiff himself stated:

Yeah. Well, I should have been more honest with [Dr. Schobert] . . . she says now . . . we want you to walk. . . . So I figured well, I got to do this 'cause I'm wanting to work. So when I started feeling pain, oh, maybe a minute and ½. Before a couple minutes I know. But I just kind of gripped down and kept walking anyway. And then she noticed something on that machine. She said are you sure you're not feeling pain? And I said yes, I am. 'Cause she seen me start to go down. Those two ladies grabbed me and they put me on this table. About scared me half to death because they got what they call a crash cart. . . . And I remember that from when I had my heart attack. And I thought oh, no. She said don't get excited. . . .

Although ALJ Evans questioned the plaintiff about why Dr. Schobert had not reported this situation in her comments, the ALJ determined expressly that Mr. Nesvold's allegations of chest pain, shortness of breath and limited activities were credible and supported by credible medical evidence. The Appeals Council in effect rejected this conclusion, finding instead that the plaintiff's subjective complaints were credible only to the extent that more than sedentary work is precluded. The Council rejected the medical evidence as well, either by ignoring it or re-interpreting it over the interpretations of the doctors themselves.

This reasoning in addition to being a strained imposition of form over substance, ignores the abnormalities of the stress test and the interpretations of Drs. Schobert, Eisenberg, and Abramson that the May, 1985, test was either positive or abnormal. There is also no basis in the record for interpreting the results of the cardiac cath-

eterization as indicative of a capacity for sedentary work, nor has the Appeals Council suggested any basis. The only reason offered for arbitrarily placing a limitation on the plaintiff's credibility in this manner, is the description of daily activities, which the Council described in conclusory fashion, as "compatible with an ability to do sedentary work," having recited such activities as doing dishes, making the bed, emptying the trash, taking short walks and driving short distances.

The daily activities described in this record do not constitute substantial evidence of a capacity for work in the context of the record viewed as a whole, nor do they provide any basis for putting a limit on the plaintiff's credibility. As previously indicated, substantial evidence must be more than a scintilla, and must be such that a reasonable mind would find it supportive of a conclusion. There is a complete absence of evidence supporting the Council's credibility limitation. While it is clearly suggested that this plaintiff will *lie in order to work*, there is no suggestion that he will *lie to get out of it*, and the ALJ appropriately found him to be fully credible in terms of subjective complaints. While admitting that at one time he would *lie* to work, Mr. Nesvold also made it clear that he did not wish to *die* for this purpose. More than one cardiologist of record suggested that in his present state of health, such an outcome could be expected if he attempted to work.

Although the findings of the ALJ are not binding on the Council, they should not be ignored. Conflicting findings are part of the record as a whole, and will be considered in determining whether the Council's decision is supported by substantial evidence. *Bauzo v. Bowen*, 803 F.2d 917, 922 (7th Cir.1986), citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951). Moreover, where the Appeals Council rejects an ALJ's credibility findings, it should do so expressly and state its reasons for doing so, in order to enable a reviewing court to determine if the Council's reasons were supported by substantial evidence. *Bauzo* at 922.

Here, the Council did not exactly find the plaintiff to be lacking in credibility. Neither did the Council clearly reject the ALJ's express finding of credibility. The discourse directly related to credibility in the Appeals Council's decision is the following:

> While the claimant's performance on the stress test indicates the residual functional capacity for light work, in consideration of his credible subjective complaints and his severe coronary artery disease shown by cardiac catheterization, the Council finds that the claimant has so severe an impairment that he has the exertional capacity for but sedentary work.

The following is offered as justification for the conclusion:

> [t]he post-exercise ST changes do not render the stress test ambiguous. Had the test stopped because of the changes and chest pain instead of due to fatigue and weakness ... [the test] would not have met the requirements of Appendix 1 and would not have been grounds for cardiac catheterization. Instead, it would have been an indication of the capacity for a full range of light work. The fact that the changes occurred afterwards is not even equivalent to this situation in severity.

There is no question that the Appeals Council has the *power* to conclude that testimony, even where uncontradicted, is lacking in credibility, since it is for the Secretary to make such findings of fact, even where the ALJ has determined otherwise. See *Parker v. Bowen*, 788 F.2d 1512, 1521 (11th Cir.1986); *Beavers v. Sec.*, 577 F.2d 383, 386–87 (6th Cir.1978). However, this court has the responsibility of deciding whether the Council's decision is supported by substantial evidence, and an ALJ's conclusion that the witness is credible, is an important factor to consider. Deference to a trier of fact's credibility finding is deeply imbedded in our law, stemming from his or her opportunity to

> ... observe the demeanor of a witness, evaluating what was said in the light of

how it is said, and considering how it fits with the rest of the evidence....

*Parker* at 1521, quoting *Beavers* at 386–87. Such a determination is invaluable and should not be discarded lightly.

■  While the Appeals Council clearly had legal authority to review this case, its reversal of the ALJ was unwarranted, having no basis in substantial evidence. Its decision was contrary to the evidence and erroneous as a matter of law. The decision of the ALJ was supported by the evidence in all respects. Therefore, the motion for summary judgment by the Secretary is DE-NIED and the plaintiff's is GRANTED. The decision of the Appeals Council is RE-VERSED and the decision of ALJ Evans is REINSTATED. The case is REMANDED for an award of benefits. SO ORDERED.