**Jesse D. MAYFIELD, Plaintiff,**

v.

**Louis SULLIVAN, M.D., Defendant.**

**No. 88 C 10702.**

United States District Court, N.D. Illinois, E.D.

Jan. 31, 1990.

A. David R. Bryant, Chicago, Ill., for plaintiff.

Frederick Branding, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff Jesse D. Mayfield instituted this action pursuant to 42 U.S.C. § 1383(c)(3) for review of the final decision of the Secretary of the Department of Health and Human Services (the "Secretary") denying plaintiff's application for social security disability insurance benefits. The parties have filed cross-motions for summary judgment. For the reasons stated, the Secretary's motion for summary judgment is denied and the case will be remanded for further consideration.

## BACKGROUND FACTS

A. *Medical Evidence.*

Plaintiff was admitted to Westlake Community Hospital on June 1, 1985 with chest pain which had begun the afternoon of the previous day. (Tr. 120.) Further examination revealed that plaintiff had experienced a myocardial infarction. While in the hospital Mr. Mayfield had resting electrocardiograms taken daily from June 2, 1985

through June 5, 1985 and again on June 10, 1985. (Tr. 213–217.) These electrocardiograms all displayed abnormal readings. An unsigned and undated interpretation of these at-rest electrocardiograms stated that the abnormality of the at-rest electrocardiograms rested in a:

QS pattern or Q wave amplitude at least ⅓ of R wave, and with a duration of 0.04 second or more....

(Tr. 210.) The interpretation also noted that certain ST/T changes indicated abnormalities. (Id.)

Mr. Mayfield was released from the hospital on June 12, 1985 with instructions for rest and rehabilitation. Certain medications were prescribed. (Tr. 125.)

After approximately 6 months off work, Mr. Mayfield returned to his job as a bus driver for the CTA. (Tr. 50.) On October 31, 1986 Mr. Mayfield, while he was driving a bus, experienced what he believed to be another heart attack. (Tr. 33, 50–51.) Mr. Mayfield testified at the administrative hearing in this matter that he believed he was experiencing another heart attack because he was ill, vomiting continuously, and was experiencing serious pain in his chest, in his head and on the left side of his face. (Tr. 51.) He was readmitted to Westlake Hospital. Laboratory tests revealed that Mr. Mayfield's cholesterol was slightly elevated, but that his electrolytes and cardiac enzymes were normal. At the hearing in this case Dr. Abramson, the administrative law judge's medical advisor, testified that although plaintiff's complaints leading to the 1986 hospitalization describe "something that sounds like a myocardial infarction," there was nothing in the record to indicate that plaintiff did suffer another heart attack at that time. (Tr. 60.)

An electrocardiogram was taken of plaintiff's heart on November 3, 1986. (Tr. 169.) The interpretation of this test indicated that plaintiff's cardiac dimensions were within normal limits; the mitral valve anterior and posterior leaflets were within nor-

mal range; there was no sign of mitral stenosis or prolapse; the aortic valve recorded well within normal range. The posterior wall and septal wall were "minimally thickened." The report noted that this could have been a "normal variant." The report's conclusion was "[n]ormal echocardiography." (Tr. 169.)

On November 5, 1986 plaintiff underwent a cardiac catheterization. This test revealed, *inter alia*, a "somewhat diseased" obtuse marginal branch, a "severely diseased" second obtuse marginal branch; a severely diseased first diagonal artery; a moderately severely diseased LAD artery; a severely diseased right coronary artery; an enlarged left ventricular cavity, and a moderately prolapsed posterior leaf of the mitral valve. (Tr. 171.)

A Bruce Protocol Exercise Tolerance Test, conducted November 4, 1986 was stopped after 8 minutes of exercise because Mr. Mayfield was experiencing substernal chest pain with burning. During this test plaintiff was able to reach only 65% of his maximum heart rate before the test was stopped. (Tr. 140.) A subsequent Exercise ECG Interpretation of this treadmill test indicated that the test was negative at more than 5 METS and less than 10 METS. (Tr. 220.)[1] The interpretation indicated that Mr. Mayfield had achieved 8–9 METS during this treadmill test. (Id.)

Another Bruce Protocol Exercise Tolerance Test was conducted on November 7, 1986. During this test plaintiff was able to exercise for only three minutes, but was able to achieve a heart rate of 156 beats per minute or 82% of his maximum heart rate. At this point the test was again stopped due to plaintiff's fatigue. The report of this test states that "[n]o significant ST/T wave changes [were] noted during or post exercise. No cardiac arrhythmia [was] noted. Blood pressure remained within normal range." The report's conclusions were (1) that plaintiff had "normal cardiac function," and (2) that it had been a normal treadmill test for this level of exer-

---

1. The level of exercise achieved during a treadmill test is considered in terms of multiples of MET's, or metabolic equivalent units. One MET is the basal oxygen requirement of the body in an inactive state, sitting quietly. 20 C.F.R. Ch. III, Part 404, Subpt. P, App. 1, 4.00 G.4.

cise. A subsequent Exercise ECG Interpretation of the November 7, 1986 treadmill test indicated that the test was negative through completion of 10 METS. (Tr. 218.)

A thallium stress test, probably conducted immediately following the 11/7/86 terminated Bruce Protocol exercise stress test, showed "no evidence of reversible or irreversible ischemia." (Tr. 172.) This report also noted: "Incidentally, a comparison was made with previous study of July 25, 1985 and there is significant interval change." (Id.) No copy of the July 25, 1985 study is in the administrative record of this case, however, and the nature of the "significant interval change" is nowhere disclosed in the medical records. At the administrative hearing, Dr. Abramson found the results of the thallium stress test significant. He stated:

Now this Thal[l]ium stress test and this is what is interesting is that no defects are noted on this stress examination. No evidence of reversible or irreversible ischemia. And the impression was a normal Thal[l]ium stress exam. Now what is interesting is a statement below that[:] "Incidentally a comparison was made with the previous study of July the 25th, 1985." That was the time he had his heart attack—his first heart attack and there is significant interval change.

In other words in 1985 there were definite signs of a myocardial infarction and now in 1986 these signs have disappeared which in my mind means that there is scar replacement, but of such minimal amount that the scan cannot pick it up.

In other words the area of absent profusion [sic?] is so small that it isn't picked up. But in any case the present Thal[l]ium stress test does not show the sign of an old infarction even though there is no question that he had an infarction.

(Tr. 63–64.)

Upon discharge, plaintiff's diagnosis was unstable angina and coronary artery disease. Mr. Mayfield was advised to consult a physician at the Foster G. McGaw Hospital of Loyola University regarding the possibility of bypass surgery.

Plaintiff was admitted to Loyola on December 4, 1986, apparently to undergo angioplasty. The angioplasty was never performed. The daily progress notes from Mr. Mayfield's stay at Loyola indicate as follows:

Called re: variety of [tests?] done as outpt—Bruce [test] to 10′, stop [due to] fatigue, [without] EKG ... HR 156. BP 150/82. In light of the above findings and the fact that myocardium in the area of one of the [?] is already infarcted, we do not believe that angioplasty is indicated at this time.

(Tr. 198.) Thus, it is unclear whether the angioplasty was not performed because, as the ALJ apparently concluded, it was not necessary (Tr. 16), or whether, as plaintiff testified and the ALJ's medical advisor assumed, the angioplasty procedure itself might have traumatized a heart vessel that was completely occluded. (Tr. 49, 65.) In a letter dated July 20, 1988 (*i.e.* after the hearing on this matter had been concluded), plaintiff's treating physician wrote to counsel for the plaintiff and explained that bypass surgery had not been performed because the small caliper of Mr. Mayfield's arteries made the benefits of such a procedure dubious. (Tr. 259.)

On May 18, 1987 a representative from the Bureau of Disability Determination Services contacted plaintiff's physician, Behrooz Eshaghy, M.D., for a report on plaintiff's condition. (Tr. 222.) Dr. Eshaghy reported that he last examined plaintiff on March 24, 1987 and that plaintiff's last three blood pressure readings (11/86, 1/87, and 3/87) had been 120/80. No end organ damage had been present. With regard to plaintiff's chest pain, the doctor reported:

The patient is having chest pain on occasion. This pain is of angina type. It is pressure like located under the chest radiating to the left shoulder. It lasts a few moments. I have not determined any precipitating factor and it occurs approximately 2 times a week. The pain is relieved by rest and Nitroglycerin.

(Id.) In response to the inquiry, "Do you have any restrictions on your patient," the doctor responded, "No, the patient is up and about as he pleases." (Id.)

Finally, the administrative record was left open after the hearing on this case so that the plaintiff could submit the findings of certain tests that were scheduled to be taken shortly after the hearing. Plaintiff submitted the results of another Bruce Protocol exercise tolerance test conducted on April 20, 1988 and another report from his treating physician.

On April 20, 1988 plaintiff was able to exercise 5 minutes and raised his heart rate to 158, approximately 83% of his maximum heart rate of 189. (Tr. 256.) At this point the test was stopped because Mr. Mayfield was experiencing shortness of breath and chest pain. There was "no significant ST depression or ST elevation noted when compared to [a] resting EKG. No cardiac arrythmia [was] noted. [Mr. Mayfield's] [b]lood pressure remain[ed] within normal range." (Id.) The conclusions reached from this test were:

1. Abnormal cardiac function for presence of shortness of breath with chest pain.

2. No evidence of ischemic changes noted or [sic] about 80% of his maximal heart rate.

3. Inconclusive test for higher maximal heart rate.

(Id.)

Finally, Dr. Eshaghy's letter, dated July 20, 1988 differed significantly from his earlier report regarding plaintiff's condition. After discussing plaintiff's previous hospitalizations, Dr. Eshaghy concluded:

Mr. Mayfield complains of chest pains occurring at least once a week and sometimes once a day. These can occur on exertion or at rest, relieved by Nitroglycerin, but with residual effects lasting up to 20 minutes.

It is my medical opinion, based on his clinical symptoms, signs and findings, that Jesse Mayfield cannot return to his past position as a bus driver. I also believe that this patient is not fit for any meaningful work activity.

(Tr. 259–60.)

B. *Administrative Hearing.*

After plaintiff's application for disability insurance benefits was denied initially and on reconsideration, plaintiff requested an administrative hearing. The hearing was held on March 22, 1988, at which time plaintiff was represented by counsel. As noted above, Dr. David Abramson appeared as a medical advisor to the ALJ.

Mr. Mayfield, born on June 6, 1946, has a high school education and worked for over fifteen years as a bus driver for the Chicago Transit Authority before filing his claim for disability. (Tr. 97.) Plaintiff testified that during his normal day he mostly sits around. Sometimes he does "a little exercise program" that the hospital set up for him. (Tr. 34.) Some unidentified problems with his right leg have prevented him from walking during the past couple of months, but when he is able to do so he can walk between two and five blocks without pain. (Tr. 47.) He occasionally drives. (Tr. 34, 52.) He experiences chest pain sometimes once a week, sometimes every other day, both when he is at rest and when he is moving. Nitroglycerin alleviates the pain, but at times it takes as long as 10 minutes to be effective. (Tr. 47.) Occasionally he loses his balance. (Tr. 52.) Mr. Mayfield has no problem lifting a gallon of milk, and testified that he can probably lift slightly more than eight pounds. (Tr. 53.) He can stand for approximately 20–30 minutes before becoming short of breath. (Tr. 54.)

At the hearing Dr. Abramson testified at length about the Bruce Protocol stress tests which Mr. Mayfield had taken. Dr. Abramson considered the November 7, 1986 test, at which plaintiff was able to achieve a heart rate of 156 beats per minute (equal to 82% of his maximal rate), as an "adequate" test for diagnostic purposes. (Tr. 62.) On the basis of this test Dr. Abramson concluded that plaintiff did not meet or exceed the requirements of Social

Security Listing 4.04 A for a finding of ischemic heart disease.[2] (Tr. 64.)

Nevertheless, Dr. Abramson concluded that Mr. Mayfield suffers from a severe impairment. "Judging from the angiograms and being aware of the fact that no procedures have been done to alter the situation in the heart," Dr. Abramson testified, he would conclude that Mr. Mayfield has a severe cardiac problem, although not one that meets or exceeds one of the Secretary's listings. (Tr. 65.)

The ALJ then questioned Dr. Abramson about plaintiff's abilities to perform work-related activities. With regard to plaintiff's ability to walk, the doctor's testimony is somewhat ambiguous:

> Well, I think it—[his disability] would not affect his walking except if he gets the pain and he says he gets the pain at two or three or—I mean he's rather indefinite about the number of blocks and some days—some days he can walk five blocks, some days two or three blocks. I don't think it interferes with his sitting or interferes with his standing.

(Tr. 66.) Dr. Abramson opined that Mr. Mayfield can probably lift 15 pounds, but that he should not lift more than 10 pounds regularly. (Id.) Dr. Abramson testified that Mr. Mayfield's activity level was more restricted in 1985 than it was in 1986. (Tr. 67.) Because of the lack of evidence at the time of the hearing about any possible changes in the condition of Mr. Mayfield's heart between 1986 and 1988, *i.e.* the time of the hearing, Dr. Abramson could not give an opinion about what restrictions should be placed on plaintiff's exertional level as of that date. (Id.)

## C. *The Decision of the ALJ.*

After reviewing the medical evidence, the ALJ concurred with Dr. Abramson's opinion that plaintiff suffers from a severe impairment, but one that does not meet or equal Listing 4.04 of the Social Security Regulations or any other listed impairment in Appendix I of those regulations. (Tr. 18.) The ALJ fully credited plaintiff's complaints of chest pain, but did not fully believe plaintiff's testimony regarding the degree to which he is incapacitated thereby:

> However, his complaints of limitation are not supported by objective medical evidence or by the opinion of his treating physician or that of Dr. Abramson. Therefore, the Administrative Law Judge finds the claimant's complaints not fully credible.

(Tr. 18.)[3]

The ALJ concluded that plaintiff was capable of performing light work, and that Mr. Mayfield does not have "any aggravating factor in his impairments that would reduce the range of light work available to him." (Tr. 19.) Since plaintiff's past relevant work as a bus driver was of a light exertional level, the ALJ concluded, Mr. Mayfield could return to that work.[4] Accordingly, the ALJ found Mr. Mayfield to be not disabled. (Tr. 19.)

Recognizing that plaintiff's past work as a bus driver might be stressful to the point

---

2. Dr. Abramson's reliance on the treadmill exercise tolerance test, as explained *infra*, was apparently founded on 20 C.F.R. Ch. III, Part 404, Subpt. P, App. 1, 4.00 G.4 (hereinafter "§ 4.00 G__") which provides, in relevant part, that "the results of a treadmill exercise test are the primary basis for adjudicating claims under 4.04 [ischemic heart disease with chest pain.]" The Regulations further provide that "[t]he criteria in 4.04B are not applicable if there is documentation of an acceptable treadmill exercise test. [I]f there is no evidence of a treadmill exercise test or if the test is not acceptable, the criteria in 4.04B should be used...." *Id.* at 4.00 G.4.

3. The ALJ did not attempt to resolve the conflict in the opinions of plaintiff's treating physician, Dr. Eshaghy, regarding Mr. Mayfield's exertional abilities. *Compare* Tr. 222 (no restrictions on plaintiff's activities) and Tr. 260 (plaintiff cannot return to his past position as a bus driver or engage in any other meaningful work activity).

4. Light work is defined in the regulations as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job is in this category when, even though the lifting requirement may be negligible, it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities. *See* 20 C.F.R. § 404.1567(b).

of aggravating plaintiff's condition, the ALJ made the alternative finding that Rule 202.21 of the Grid required a finding that plaintiff was not disabled since plaintiff was a younger individual, had graduated from high school, and was capable of performing a full range of light work. (Tr. 19.)

## DISCUSSION

The sole issue for this court to decide is whether the decision of the Secretary is supported by substantial evidence. As more than one court has explained, substantial evidence "means more than a mere scintilla; rather, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nesvold v. Bowen*, 683 F.Supp. 1246 (N.D.Ind. 1988), *citing Ray v. Bowen*, 843 F.2d 998 (7th Cir.1988). Moreover, although the function of this court in undertaking a disability review is not to reweigh the evidence, "decide the facts anew, or substitute its own judgment for that of the Secretary, it is not an uncritical rubber stamp for the Secretary's decision." *Nesvold, supra*, 683 F.Supp. at 1250. Where the Secretary's decision is supported by substantial evidence, however, the court will affirm absent an error of law.

Plaintiff's only argument on appeal is that the ALJ erred by ignoring the at-rest ECGs and relying instead on what plaintiff contends are unacceptable exercise tolerance tests. Plaintiff argues that the at-rest ECGs and the interpretation thereof indicate that plaintiff's condition met Listing 4.04 B.1, thereby rendering him disabled *per se*.[5] *DeFrancesco v. Bowen*, 867 F.2d 1040, 1042 (7th Cir.1989).

Plaintiff's argument regarding the unacceptability of the treadmill exercise tolerance tests turns on his interpretation of § 4.00 G.2. In relevant part § 4.00 G.2 provides:

When an exercise test is purchased, it should be a treadmill type using a continuous progressive multistage regimen. The targeted heart rate should be not less than 85 percent of the maximum predicted heart rate unless it becomes hazardous to exercise to the heart rate or becomes unnecessary because the ECG meets the criteria in 4.04A at a lower heart rate....

Plaintiff contends that unless a claimant is able to achieve a heart rate equivalent to 85% of his maximum rate during a treadmill exercise tolerance test, the test is unacceptable for purposes of determining disability. Since he was only able to achieve heart rates of 82% of his maximum rate in the treadmill test of November 7, 1986 and 83.6% in his treadmill test of April 20, 1988, plaintiff argues, the tests were unacceptable for diagnostic purposes and were improperly used by the ALJ.

In further support of his argument plaintiff quotes from what he has represented to be "[t]he leading cardiological reference work on heart disease." (Plaintiff's Mem., p. 10.) According to plaintiff this text provides:

Another cause for uninterpretable exercise electrocardiograms is failure to achieve 85% of predicted maximal heart rate with no ST-segment changes.

\* \* \* \* \* \*

In view of the relatively low sensitivity (70 to 85% of exercise stress electrocardiography (p. 1683), a negative result does not rule out ischemic heart disease ... A major limitation of the sensitivity of the exercise electrocardiogram is that it cannot be interpreted in many patients. This includes patients who are incapable of reaching the level of exercise required for near-maximal effort (85% or more of maximal predicted heart rate), particularly those on beta-adrenoceptor blockers or

---

**5.** Listing 4.04 B.1 provides that a claimant will be deemed disabled if, "[i]n the absence of a report of an acceptable treadmill exercise test ...," objective medical evidence demonstrates:
  Transmural myocardial infarction exhibiting a QS pattern or a Q wave with amplitude at least ⅓ of R wave and with a duration of 0.04 second or more. (If these are present in leads III and aVF only, the requisite Q wave findings must be shown, by labelled tracing, to persist on deep [re]spiration.)

those who develop fatigue, leg cramps or dyspnea ... [6]

■ The court does not concur with plaintiff's assumption that 4.04 G.2. sets a standard of acceptability for exercise treadmill tests which, unless met, precludes *any* use of those tests by the Secretary in determining disability. Section 4.00 G, entitled "Exercise testing," regulates when a treadmill test should be purchased by the Secretary in order to make a determination of disability and the methodology such tests should employ, and the evaluation of the results of those tests. The regulation nowhere indicates that an 85% rate is a minimum beyond which a treadmill test is not diagnostic.

Although the court concurs that at some point a treadmill exercise test is unacceptable due to the test taker's failure to achieve a certain level of exertion, the court believes that the ALJ was justified in this case in accepting Dr. Abramson's conclusion that the treadmill test of November 7, 1986 was adequately diagnostic. (Tr. 62.) The ALJ also had the benefit, which Dr. Abramson did not, of the results of the treadmill stress test conducted after the administrative hearing on this matter. That test, at which plaintiff was able to achieve a heart rate of almost 84% of his maximum rate, confirmed the earlier test's conclusions that: (1) there was no significant ST depression or ST elevation when compared with Mr. Mayfield's resting EKG; (2) that no cardiac arrythmia was noted; (3) that Mr. Mayfield's blood pressure remained within a normal range; and, (4) that there was no evidence of ischemic changes, at least to a heart rate approximately 80% of plaintiff's maximum rate. (Tr. 256.)

In light of Dr. Abramson's conclusion that the 11/7/86 Bruce Protocol exercise tolerance test was acceptable for diagnostic purposes, and the confirmation of the results of that test by the results of the April 20, 1988 test (at which plaintiff was able to achieve a heart rate almost 84% of his maximum rate), the court believes that the ALJ's conclusion that these tests were acceptable for diagnostic purposes was reasonable. The court is not prepared, therefore, to reverse the ALJ and award benefits on the basis that the at-rest electrocardiograms establish that plaintiff is disabled *per se* by reason of Listing 4.04 B.1.[7]

Although the court has determined that the ALJ's decision not to ignore the results of the treadmill exercise tolerance tests was reasonable and not contrary to the regulations, the court nevertheless has determined that remand is appropriate in this case. The court believes that, at least in this case where the level of exertion achieved by the plaintiff during the treadmill tests called into question the validity of the tests' results, the ALJ improperly accorded the treadmill tests a priority that was undeserved. The court also believes that given the inconclusiveness of the medical evidence, further testing is necessary. Finally, the court has concluded that the ALJ should have consulted a vocational expert in making the determination of whether Mr. Mayfield is capable of performing the full range of light work.

### a. *medical evidence.*

■ In its entirety the medical evidence in this case indicates that the determination that plaintiff was not disabled *per se* was a very close call. The court believes that the close call was improperly resolved by rely-

6. Eugene Braunwold, M.D., *Heart Disease, A Textbook of Cardiovascular Medicine* (Philadelphia: W.B. Saunders Co., 1988), pp. 335, 1322.

7. A significant problem, moreover, exists with plaintiff's argument that his condition meets the requirements of Listing 4.04 B.1. In his memorandum in support of summary judgment plaintiff states, "It is not disputed that the results of all resting Ecg in the record demonstrate that Mr. Mayfield met the criteria for Listing 4.04(B)(1)." (Plaintiff's Mem., p. 9.) Plaintiff has ignored, however, the statement of Dr. Abramson that without evidence that the abnormal Q wave findings persisted upon deep respiration (*see* Tr. 64), Dr. Abramson could not state that plaintiff's condition met the requirements of Listing 4.04 B.1. In the absence of any contrary evidence (or explanation) on the issue, therefore, the court can only conclude from the implication in Dr. Abramson's testimony that the indications of ischemic heart disease present on the at-rest ECG were present in Leads III and aVF only. *See* n. 5, *supra*.

ing, to the exclusion of other contrary evidence, on the Bruce Protocol exercise tolerance tests. As Judge Sharp noted in *Nesvold, supra,* the Secretary's preference for stress tests to the exclusion of other evidence in cases involving ischemic heart disease has been held to conflict with the provisions of 42 U.S.C. §§ 423 and 1382, which require an opportunity to present all relevant evidence. *Id., citing New York v. Bowen,* 655 F.Supp. 136, 142 (S.D.N.Y. 1987).

Without the treadmill stress tests, plaintiff contends, Mr. Mayfield would have met Listing 4.04 B.1. The court is not convinced that this is correct. As noted above (*see* n. 7), the court (and apparently even the ALJ's own medical advisor) are without sufficient information to make that determination. The ALJ and Dr. Abramson, however, appear to have believed that the at-rest ECGs could be ignored because the medical evidence included the results of the treadmill tests. *See* Tr. 60 ("But we have to fall back in this case, not on resting electrocardiograms which Counsel has talked about, but upon the last stress test.") The court believes that, in light of the record as a whole, the ALJ should have discovered whether the indications of ischemic heart disease found by the at-rest electrocardiograms were in Leads III and aVF only, and if so, ordered that the deep respiratory testing be done.

Moreover, the results and importance of Mr. Mayfield's cardiac catheterization, which indicated that substantial areas of plaintiff's heart are severely diseased, were all but ignored by the ALJ. (Tr. 16.)[8] Dr. Abramson indicated that the cardiac catheterization report of November 5, 1986 "may very well" have indicated that plaintiff met or exceeded the requirements of Listing 4.04 B.7.[9] In discussing the angiograms, Dr. Abramson testified:

He's had two angiograms. They don't—the description of the angiograms is not clear cut enough for me to say what degree of occlusion occurred. In other words they say—they used the terms severe occlusion. But they don't say 70 percent occlusion or exactly where the occlusion took place. They say in a proximal portion of an artery, but they would not indicate exactly how much occlusion—how much stenosis there was.

Now the claimant states that one of his vessels recently—that is in—in 1970—1986 when he was at [Loyola] was completely occluded, but it's just that the—the description of the angiograms isn't enough for me to be certain that the findings equal 404B7b. It may very well be that they do.

But we have to fall back in this case, not on resting electrocardiograms which Counsel has talked about, but upon the last stress test.

(Tr. 60–61.)[10]

The court believes that the ALJ erred by not seeking additional angiographic information regarding the degree to which plaintiff's proximal coronary arteries were occluded, particularly in light of Dr. Abramson's apparent belief that the arter-

---

8. The court notes that the ALJ probably erred when he stated that the angioplasty procedure was not performed in December of 1986 because "it was decided that it was unnecessary...." (Tr. 16.) As stated earlier in this opinion, Mr. Mayfield testified and Dr. Abramson confirmed that the angioplasty was not performed because of the trauma the procedure could cause to Mr. Mayfield's probably completely occluded heart vessels. (Tr. 65.)

9. Listing 4.04 B.7.b. concerns angiographic evidence of ischemic heart disease. Under this listing a claimant will be found disabled *per se* if, again in the absence of an acceptable treadmill test, angiographic evidence establishes 70 percent or more narrowing of a proximal coronary artery.

10. *See also* Dr. Abramson's testimony at Tr., p. 65:

Now when he states that the doctors found arteries occluded, I—I don't have that information but I assume that it's there otherwise they would not have done—they would have done something. The fact that they had him in the hospital and then sent him out without doing something makes me feel that he had complete occlusions that don't respond to—very well or at all—to angioplasty because you have to push that balloon through the complete occlusion and you could traumatize a vessel and as he said tear the vessel.

ies may well have met the requirements of § 4.04 B.7.b. It was error to simply "fall back" upon the last stress test in the face of other significant evidence indicating that plaintiff's condition might be severe enough to be *per se* disabling.

### b. *RFC determination.*

■ The court also believes that the ALJ erred by making the determination that plaintiff could return to his job as a bus driver or, alternatively, could perform the full range of jobs categorized as involving light work, without consulting the advice of a vocational expert.

The ALJ found Mr. Mayfield's testimony concerning the degree to which his daily activities are limited not "supported by objective medical evidence or by the opinion of his treating physician or that of Dr. Abramson." (Tr. 18.) Although the court recognizes that an ALJ's credibility determinations are entitled to considerable deference, *see Steward v. Bowen,* 858 F.2d 1295, 1302 (7th Cir.1988), the court's own review of the medical evidence, Dr. Eshaghy's opinions and Dr. Abramson's testimony has led it to conclude that the ALJ's determination was not supported by substantial evidence.

As explained above, the court believes that the objective medical evidence in this case is far from clear-cut, and substantial portions of it lend credence to plaintiff's testimony regarding the degree of his limitations. The ALJ never explained why he chose to disregard entirely Dr. Eshaghy's letter of July 20, 1988, which stated that plaintiff was incapable of performing any substantial work activity. Although the court recognizes that Dr. Eshaghy's letter contradicts his earlier telephone report, the court believes that the ALJ was obligated to deal with that conflict, particularly in light of plaintiff's testimony that he would feign feeling well when he was at Dr. Eshaghy's office in order to convince the doctor that he was fit to return to work (Tr. 72.) *Cf., Nesvold, supra,* 683 F.Supp. at 1253 (While it was "clearly suggested that this plaintiff will *lie in order to work,* there is no suggestion that he will *lie to get out of it* ...") (emphasis in original).

Finally, the ALJ also relied on the testimony of Dr. Abramson as support for his finding that Mr. Mayfield's complaints about the degree to which his disability limits his ability to exert himself were not fully credible. The court finds no such support in the medical advisor's testimony.

Dr. Abramson concurred with plaintiff's testimony that he could not regularly lift more than 10 pounds and apparently believed plaintiff's testimony that he could not walk much more than 3 to 5 blocks without chest pain. The court's review of the record in this case has led it to conclude that the ALJ founded his opinion that plaintiff was capable of performing the full range of light work on the basis of the following dialogue between the ALJ and Dr. Abramson:

Q. I have no—doctor, keeping in mind the history of his stopping work at the time that he became ill while driving a bus and was hospitalized to have the tests that were given in 1986—that was in October or November of '86, would it be your opinion that he might have been more restricted at that time than he is now or how would you advise it.

A. Well all I can do is go on the basis of—of his two tests ... The '86 stress test was certainly improved over the '85. So he was better at ... '86. But what's happened between '86 and '88 I have no evidence—no objective evidence.

Q. Your—your opinion testimony given here is based on the objective evidence that was available as of November of '87—

A. That's—

Q. —'86?

A. '86, yes. I have no other evidence. (Tr. 67.)

The court fails to see how Dr. Abramson's opinion that plaintiff was better in 1986—at the time he stopped working due to severe chest pain and constant vomiting and was hospitalized for cardiac testing— than he was in 1985 (when he experienced a myocardial infarction) could support the conclusion that plaintiff is thereby capable of performing in 1988 the duties of a bus

driver for the CTA or the full range of light work.

The record, the court has concluded, is simply devoid of any information regarding whether plaintiff could actually be hired as a bus driver given the risk he may have of experiencing another myocardial infarction while driving. *See DeFrancesco v. Bowen,* 867 F.2d 1040, 1044 (7th Cir.1989) (plaintiff's testimony that he occasionally mixes up the brake and gas pedals because of diminished sensation in his feet precluded finding that plaintiff could do full range of light work: "No responsible employer would hire a person to drive a delivery van or do other work involving the use of foot controls if the person had numb feet....") Moreover, no information exists in the record as to whether the responsibilities and stress of driving a bus could aggravate plaintiff's condition.

Since the court has concluded that this is a "borderline" case, the ALJ was required to consult a vocational counselor in order to make a determination of whether plaintiff could perform the duties of a bus driver for the CTA or, alternatively perform the full range of light work as that term is defined in the regulations. *DeFrancesco, supra,* 867 F.2d at 1045. As Judge Posner noted in *DeFrancesco,* in borderline cases the Social Security Administration requires its administrative law judges to "hear testimony by a vocational specialist concerning whether there are enough jobs that *this* claimant can *actually* do to warrant a conclusion that the medical condition is not totally disabling. This is a civilized method of resolving borderline cases...." *Id.* (emphasis in original).

### CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment is DENIED. Plaintiff's cross-motion for summary judgment is GRANTED: the case is remanded to the Secretary so that additional medical evidence can be procured. If the objective medical evidence fails to establish that plaintiff is disabled *per se* by reason of ischemic heart disease, the Secretary shall enlist the services of a vocational expert in order to determine to what degree plaintiff is capable of performing substantial gainful activity.